UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 01237 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THOMAS DART, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darryl Harper, a disabled inmate at Cook County Jail, filed this suit against Sheriff Thomas Dart and Cook County alleging violations of his civil rights under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*[1] R. 19, First Am. Compl. Under the Prison Litigation Reform Act (PLRA), a prisoner may not bring any suit about his prison conditions under federal law without first exhausting "such administrative remedies as are available." 42 U.S.C. § 1997e(a). Defendants alleged that Harper had not properly exhausted his administrative remedies, and the Court convened what is known as a *Pavey* hearing to resolve factual issues related to exhaustion. *See Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008); R. 42, Mot. for Pavey Hrg. Based on the evidence presented at the hearing, the Court now concludes Defendants have not carried their burden to show that Harper failed to

---

[1]The Court has federal-question jurisdiction over Harper's claims under 28 U.S.C. § 1331. Citations to the docket are "R." followed by the docket entry number.

exhaust the available administrative remedies. Harper's suit will therefore not be dismissed for a failure to exhaust under the PLRA.

## I. Background

Darryl Harper has been a pretrial detainee in the Cook County Jail since March 12, 2013. First Am. Compl. ¶ 5. Harper, who is paralyzed from the chest down, is wheelchair bound.[2] R. 75-2, Compassionate Consideration Letter at 1; First Am. Compl. ¶ 2. Because of his medical condition, Harper has primarily been housed at the Cermak Infirmary. R. 57, Pl.'s Pre-Hrg. Resp. Br. at 3. Harper alleges that his rights have been violated during his time at Cermak because (1) he has not been housed in an ADA-compliant (that is, wheelchair-accessible) unit and (2) the grievance system is inadequate. First Am. Compl. ¶¶ 9-12, 16-19.

When Harper arrived at Cook County Jail, he was processed directly through the Cermak Infirmary rather than through the jail's "receiving" department. R. 74, Hrg. Tr. at 44:8-45:9. At some point during the admissions process, Harper signed a document which stated that he had received the Inmate Rules and Regulations. R. 53-1, Jail History Card at 1; Hrg. Tr. at 21:16-22:25 (Harper admitting that he signed the jail history card). The Inmate Rules and Regulations (also known as the Inmate Information Handbook) spell out the procedures for inmate grievances and requests. R. 53-1, Inmate Handbook at 20-22; *see also* Hrg. Tr. at 97:1-21 (noting that the Inmate Rules and Regulations and the Inmate Handbook are the same document). Although Harper signed the jail history card and the card bears an

---

[2]Harper also suffers from several other ailments, including chronic and recurring infections, hypertension, anemia, and hepatitis C. R. 75-2, Compassionate Consideration Letter at 1.

2

acknowledgment of receipt of the handbook, he claims he did not actually receive the handbook itself. Hrg. Tr. at 23:3-5, 45:13-15. Instead, he learned about the grievance procedures from other inmates in the jail. *Id.* at 45:16-46:4.

The Inmate Handbook distinguishes between "requests" and "grievances." Inmate Handbook at 20-22. The Handbook instructs an inmate to make a request "when [he] would like or need[s] assistance, services, or basic supplies." *Id.* at 20. For example, and inmate should file a request "[i]f [he] require[s] accommodations because [he has] a disability." *Id.* Grievances, on the other hand, are used to "seek review of a problem related to [a detainee's] conditions of confinement." *Id.* An inmate should file a grievance if he believes his "Constitutional or other legal rights have been violated," among other things. *Id.* at 20-21. A grievance must be filed within fifteen days of the event giving rise to the complaint. *Id.* at 21. The Department of Corrections or one of its departments then has fifteen business days to respond. *Id.* The inmate will get a written decision; if he does not agree with the decision, he has fourteen days to appeal. *Id.* at 22.

The Inmate Handbook does not have any information on appealing denied or ignored requests. *Id.* at 20. According to Department-of-Corrections staff, requests (as distinct from grievances) cannot be appealed at all. Hrg. Tr. at 63:2-20, 89:17-25. If an inmate is dissatisfied with the response to a request or if no response is received, he must refile the request as a grievance and obtain an identifier known as a control number. *Id.* He may then pursue the grievance appeals process. *Id.* The grievance form itself instructs inmates that they "may re-submit the grievance issue

3

after 15 days to obtain a 'Control Number' if there is no response to the request or the response is deemed unsatisfactory." *See, e.g.,* R. 75-2, Jan. 24, 2014 Grievance; Hrg. Tr. at 89:17-25. According to the defense, the "control number" transforms the request into a grievance. R. 78, Defs.' Post-Hrg. Resp. Br. at 9. The inmate must then wait for a response to his grievance, and, if he is unhappy with that response, he may appeal using the ordinary grievance appeals process. Hrg. Tr. at 96:4-25.

Harper claims that he was not informed of the refiling policy. *Id.* at 36:10-37:3. He says that his correctional rehabilitation worker, Susie Harris-Richardson, told him that once a request is denied, "it's over with." *Id.* at 31:12-14. Harris-Richardson denies telling Harper that a denied request was a "dead issue" and insists that she would have helped Harper refile his request as a grievance if he had asked. *Id.* at 124:11-18, 150:22-151:3.

Harper submitted two grievance forms concerning the issues central to this case. In the first, dated January 24, 2014, Harper complained that, since his return from Stroger Hospital on December 23, 2013, he had been housed in a cell that was not ADA accessible. Jan. 24, 2014 Grievance. He gave the grievance to Harris-Richardson on January 31, 2014. *Id.* Harris-Richardson marked the grievance as a request. *Id.* She testified that she did this because the "date that the incident occurred" was December 23, 2013 (when he returned from Stroger Hospital), and so the grievance was (in her view) untimely. Hrg. Tr. at 120:2-11. John Mueller, supervisor of Inmate Services, endorsed Harris-Richardson's approach, stating that an untimely grievance can be processed as a request. *Id.* at 62:13-63:1 ("[T]he

4

[untimely] complaint is still addressed, either through instruction back to the inmate of what needs to be done, or a response directly to the inmate with regards to the allegation as a nongrievance request."). There is no evidence that Harper ever received a response to what was deemed his first request. *Id.* at 78:11-22. Harper did not refile the request as a grievance. *Id.* at 12:10-19, 65:20-22.

Harper's second grievance form, submitted on February 7, 2014, was typed by his attorneys. *Id.* at 33:5-15; R. 75-2, Feb. 7, 2014 Grievance at 1. In the typewritten grievance, Harper complained that he had "been deprived an accessible living unit for a wheelchair bound person." Feb. 7, 2014 Grievance at 2. Specifically, the shower did not have grab bars, and the shower chair was so dirty that Harper "fear[ed] for [his] life given [his] exposed wounds." *Id.* Harper also complained that "the grievance process at the Jail is inadequate [because] [t]he social worker assigned to [unit] 3N infrequently visits the living unit and does not make herself available to address the serious concerns of inmates." *Id.* Harris-Richardson collected the grievance form that same day. *Id.* at 1. Harris-Richardson and Mueller determined that it should be processed as a request because it was "more of a general complaint of various issues that the inmate has." Hrg. Tr. at 69:5-19, 133:24-134:1. Mueller then responded to the request, telling Harper that he had to separate out each issue and provide a specific date and location for each incident about which he was complaining. *Id.* at 69:15-19; Feb. 7, 2014 Grievance at 3. Mueller crossed out the portion of the grievance form labelled "Inmate's Request for

5

an Appeal." Feb. 7, 2014 Grievance at 3. Harper did not refile the denied request as a grievance. *Id.* at 12:10-19, 36:20-37:3.

## II. Legal Standard

Failure to exhaust administrative remedies as required by the PLRA is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Like most every other affirmative defense, the burden of proof is on the defendants to show that the prisoner failed to exhaust. *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). When there are disputed questions of fact surrounding exhaustion, the district court must "conduct[ ] a hearing on exhaustion" and make factual findings as to whether the prisoner has satisfied the exhaustion requirement of the PLRA.[3] *Pavey*, 544 F.3d at 741-42 ("Not every factual issue that arises in the course of a litigation is triable to a jury as a matter of right."); *see also Wagoner v. Lemmon*, 778 F.3d 586, 591-92 (7th Cir. 2015) (distinguishing the exhaustion inquiry from summary judgment). If the district court concludes that the prisoner has exhausted available administrative remedies, then the case may move onto the merits. *Pavey*, 544 F.3d at 742 (noting that the jury, should the case reach trial, will not be "bound by (or even informed of) any of the findings made by the district judge" in the exhaustion inquiry). If the district court concludes that the prisoner has not exhausted his remedies, then the court will either permit the prisoner to go back and exhaust or, if failure to exhaust was the prisoner's fault, it will dismiss the case. *Id.*

---

[3]Ordinarily, discovery on the merits of the case should be stayed until the exhaustion issue is decided, *see Pavey*, 544 F.3d at 742, as is the case here, *see* R. 44, Nov. 18, 2014 Minute Entry (staying merits discovery pending the resolution of the exhaustion issue).

6

## III. Analysis

Under the PLRA, an inmate must properly exhaust administrative remedies by following the applicable procedural rules for grievances. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). That is, he must "take all steps prescribed by the prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004). A prisoner is only required, however, to exhaust the administrative remedies that are "available" to him. 42 U.S.C. § 1997e(a). "Prison authorities cannot immunize themselves from suit by establishing procedures that in practice are not available because they are impossible to comply with or simply do not exist." *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015). To that end, prisoners are only "required to exhaust grievance procedures they have been told about, … not procedures they have not been told about,"[4] *id.* at 896, meaning that

---

[4]Contrary to Harper's position, this does not mean that the availability of administrative procedures is a subjective inquiry—that is, dependent on the knowledge of the prisoner in question. "A prisoner's lack of awareness of a grievance procedure … does not excuse compliance." *Twitty v. McCoskey*, 226 F. App'x 594, 596 (7th Cir. 2007). The PLRA "says nothing about a prisoner's subjective beliefs, logical or otherwise, about administrative remedies that might be available to him." *Id.* (quoting *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000)); *see also Hudson v. Corizon Med. Servs.*, 557 F. App'x 574, 574-75 (7th Cir. 2014) (holding that a procedure is unavailable if it "was concealed by prison officials or otherwise unknowable to [the prisoner].").

Even if the exhaustion inquiry were a subjective one, the Court finds that Harper was given the Inmate Handbook upon his arrival at Cermak Infirmary. Even though Harper testified that he did not receive the handbook, he did admit that he signed the statement acknowledging that he had in fact received it. Hrg. Tr. at 21:16-22:25, 23:3-5, 45:13-15. Harper's credibility on receipt of the handbook when he signed the admission card is undermined because Harper testified that he was ill when he was admitted and that he does not even remember signing the documents at all. *Id.* at 45:10-12; First Am. Compl. ¶ 6; *see also* Compassionate Consideration Letter at 1 (detailing Harper's many medical issues).

only reasonably publicized procedures must be exhausted. This means that the jail's *stated* policy is the key; inmates "are not required to divine the availability of other procedures." *Id.* ("If authorities could change their grievance rules once litigation began or simply keep prisoners in the dark about the real rules, they could always defeat prisoner suits by announcing impossible procedural hurdles beforehand and then, when they are sued, explaining that they would have waived the requirements for the plaintiff."); *see also Hurst v. Hantke*, 634 F.3d 409, 411 (7th Cir. 2011) ("[A] remedy is not available if essential elements of the procedure for obtaining it are concealed.").

There is no dispute that Harper filed his January 24th and February 7th grievances on the grievance form provided by the jail. Harris-Richardson and Mueller decided that those complaints should be processed as "requests." Hrg. Tr. at 62:13-63:1, 69:5-19, 120:2-11, 133:24-134:1. That determination was made solely by jail staff; it was not within Harper's control. Harper only received one response to his requests, Hrg. Tr. at 78:11-22; Feb. 7, 2014 Grievance at 3, and in that response, the appeals section had been crossed out, Feb. 7, 2014 Grievance at 3. And although the Inmate Handbook details the appeals procedures for *grievances*, it is completely silent about appealing denied or ignored *requests*. Inmate Handbook at 20-22. In

---

Harper also testified that he had no memory of signing various other documents, despite identifying his signature on those documents. Hrg. Tr. at 41:2-43:4; *see also id.* at 35:9-12 ("I was having problems writing and understanding things because the infection was playing with my brain. I had lost memory to a lot of things."). Given Harper's memory problems and the admitted authenticity of his signature on the jail history card, it is more likely than not that he did, in fact, receive the Inmate Handbook upon his arrival at the Cermak Infirmary. So even under a subjective standard, Harper can be charged with knowledge of the provisions of the Inmate Handbook.

8

fact, jail staff testified that requests may not be appealed at all. Hrg. Tr. at 63:2-20, 89:17-25. So, based on the information in the Inmate Handbook, Harper had "take[n] all steps prescribed by the prison's grievance system." *Ford*, 362 F.3d at 397; *see also Munoz v. Dawalibi*, 2015 WL 719373, at *6 (N.D. Ill. Feb. 18, 2015) (holding that a prisoner exhausted administrative remedies when his grievances were processed as requests and he did not refile to get a control number).

Defendants argue that, despite the absence of instruction in the Inmate Handbook, the jail's exhaustion procedures require an inmate to resubmit a denied or ignored request as a grievance and get a control number. Defs.' Post-Hrg. Resp. Br. at 9-10. Once the request is resubmitted as a grievance, the defense says, the inmate must follow the grievance exhaustion procedures. *Id*. The defense bases this argument primarily on the language on the grievance form, which states that "[w]hen a grievance issue is processed as a NON-GRIEVANCE (REQUEST), an inmate may re-submit the grievance issue after 15 days to obtain a 'Control Number' if there has been no response to the request or the response is deemed unsatisfactory." Jan. 24, 2014 Grievance at 1. Although this language does suggest that the jail has some kind of policy requiring (though "requiring" might be overstating the policy, because the form uses the word "may") inmates to refile requests as grievances to exhaust, the testimony of Corrections staff suggests that this policy is not available in practice.

For one, the testimony of jail personnel reveals that an inmate who refiles a request based on the language of the grievance form might not get a control number

9

at all. The control number is what supposedly transforms the request into a grievance and opens up the grievance appeals process to what had been an unappealable request. Defs.' Post-Hrg. Resp. Br. at 9. Mueller, the supervisor of Inmate Services, testified that grievances that a correctional rehabilitation worker believes are untimely are typically marked as requests. Hrg. Tr. at 62:19-63:1, 101:18-22 ("Q. [I]f the complaint is submitted past the 15 days is it still processed in a way? [ ] A. … either through instruction back to the inmate of what needs to be done, or a response directly to the inmate with regards to the allegation as a nongrievance request."). If an untimely grievance is marked as a request and the inmate is dissatisfied with the response, Mueller testified that the inmate must refile that request as a grievance. *Id.* at 63:11-20. The inmate can do that by rewriting the same complaint onto a new grievance form. *Id.* at 143:25-144:9. But if the initial complaint was untimely, resulting in the complaint being marked a request, refiling the exact same complaint would also be untimely. And both Mueller and Harris-Richardson stated that a refiled request that was (still) untimely would not necessarily get a control number. *Id.* at 138:20-142:2; R. 57-1, Mueller Dep. at 70:21-71:20; *see also* Hrg. Tr. at 99:23-101:1 (impeaching Mueller with his deposition testimony).

During his in-court testimony, Mueller said that the untimeliness of a refiled request would not prevent the rehab worker from issuing a control number. Hrg. Tr. at 99:6-20. In his deposition, however, Mueller stated that the now-doubly-untimely grievance would *not* be given a control number:

10

> Q. You would agree that Mr. Harper could not appeal the response to [a request], correct?[5]
>
> A. That's correct. Within 15 days of him either receiving a response or being unsatisfied with the response he did get, he could have re-filed it and a control number would've been issued.
>
> Q. And you would've automatically provided a control number to Mr. Harper?
>
> A. Ms. Richardson.
>
> Q. Ms. Richardson would have automatically given a control number if Mr. Harper submitted the same document?
>
> A. That's what they're trained. If she deems it—and again, it all depends on her inquiry into whether it was a timely process or not.
>
> …
>
> Q. Assuming Mr. Harper filed the exact same document 15 days after Ms. Richardson collected, would you have expected Ms. Richardson to mark it as a grievance?
>
> A. If Ms. Richardson deemed it in the process and deemed it as being non timely, the answer is no.

Mueller Dep. at 70:21-71:20. Harris-Richardson was more confident that a control number would be issued in most cases, but she still refused to say that a control number would automatically be issued to a refiled request:

> THE COURT: [If] the inmate wants to resubmit [his request] to you as a grievance, … would you automatically give that grievance a control number?
>
> THE WITNESS: Yes. We can give that—we have the option to give that grievance a control number, and more than likely it would be given a control number, yes.

---

[5] In this line of questioning, Mueller was discussing a complaint filed by Harper that is not at issue in this case. *See* Mueller Dep. at 64:5-7 (directing Mueller to the document marked HARPER DART33); R. 42-1, Jan. 23, 2014 Grievance at 2 (labelled HARPER DART33). Much like the complaints at issue in this case, however, the January 23, 2014 complaint was marked as a request. Jan. 23, 2014 Grievance at 2.

11

> THE COURT: Okay. You say an option, or more than likely. Are you required to give it a control number now that the inmate has resubmitted it to you after waiting the 15 days?
>
> THE WITNESS: Yes, we—yes, we are more or less required to give it a control number.
>
> THE COURT: Okay. I just want to make—
>
> THE WITNESS: I'm being—not complex upon it, but it's depend[ent] upon what the issue is. And so in this case he would've been given a control number, more than likely.

Hrg. Tr. at 138:20-139:24. When asked what factors she would consider in deciding whether to award the refiled request a control number, Harris-Richardson said that she would try to determine if the inmate had an excuse for his failure to make a timely grievance. *Id.* at 139:25-140:13. Even if there were no excuse for the failure to file a timely grievance, Harris-Richardson said that she "would probably still give [Harper] a control number," because she would take into account the "nature of the grievance." *Id.* at 140:14-142:2.

Based on this testimony, it becomes apparent that an inmate could become trapped in a never-ending cycle of unappealable requests. An inmate files a complaint, like Harper did, about an ongoing problem with the accessibility of his cell. That complaint has a date in it—in Harper's case, the date on which he returned to Cermak Infirmary from Stroger Hospital. Jan. 24, 2014 Grievance at 1. Although the inmate continues to live in an inaccessible cell at the time the complaint is filed, the rehab worker determines that, based on the date included in the text of the complaint, the complaint is untimely. It is marked as a request. When the inmate seeks to refile the request as a grievance, the rehab worker

determines that it is, of course, still untimely, and marks the refiled complaint as a request again. This could repeat indefinitely.

Also troubling is the apparent confusion among jail personnel as to *when* a request may be refiled as a grievance. The language of the grievance form says that "[w]hen a grievance issue is processed as [a request]," an inmate who is unsatisfied with the response or lack of response "may re-submit the grievance issue *after* 15 days." Jan. 24, 2014 Grievance at 1 (emphasis added). The plain meaning of this language is that an inmate must wait at least fifteen days after some trigger (receiving an unsatisfactory response or receiving no response after, presumably, fifteen days) to refile his request as a grievance. Mueller, however, testified that the inmate "can re-file the grievance *within* 15 days." Hrg. Tr. at 89:17-25 (emphasis added). Harris-Richardson added to the confusion, stating both that the inmate can resubmit immediately and that the inmate must wait fifteen days:

> THE COURT: But are you saying that even though it says *after* 15 days, it's okay for the inmate to just tell you right then and there, I want to resubmit this?
>
> THE WITNESS: Yes. Because they will ask, if they're unsatisfactory with it—with the—with their response, they will ask, or they will declare that I'm going to resubmit this grievance.
>
> …
>
> THE COURT: Right. But they can—are you saying they do not have to wait 15 days?
>
> THE WITNESS: Oh, no, sir. I see your point. I apologize. So, yes, sir. Yes. I see. They have 15 days to obtain the control number. Yes, sir.
>
> THE COURT: So they do have to wait 15 days?

13

> THE WITNESS: Days, yes, sir. I apologize. I was just strictly talking about them having the opportunity of resubmitting the grievance, a portion of it.

*Id.* at 147:25-148:22 (emphasis added). Attempting to clarify, Harris-Richardson seemingly created different rules for requests that received responses and requests that did not. If the inmate has *not* received a response to his request, he must wait fifteen days before resubmitting the same complaint to get a control number.[6] *Id.* at 158:17-20. If the inmate has received a response to his request, he can refile right away; there is no need to wait until another fifteen days has passed. *Id.* at 150:5-24. And although he can immediately resubmit, an inmate who receives a response to his request has a fifteen-day window in which to decide whether to resubmit or not. *Id.*; see also Defs.' Post-Hrg. Resp. Br. at 10 (stating that a detainee who is dissatisfied with the response to his request "can immediately resubmit it [upon receiving the response], or within 15 days, to obtain a control number to make it a grievance"). Under that regime, if an inmate were to stick to the language of the grievance form and wait to refile until *after* fifteen days had passed, his refiled complaint would be untimely:

> THE COURT: But let me—so let me just ask, if he waited 16 days, okay, after giving—being given the response that we deem this is a nongrievance request. All right? Say we're giving this back to you, it's a nongrievance request—
>
> THE WITNESS: Yes.
>
> THE COURT: And here's our response—

---

[6]It could be challenging for an inmate to comply with this rule, because he will not know that his grievance has been processed as a request until he gets the response. Hrg. Tr. at 154:22-25 ("Q. So the first time a detainee knows whether the document is processed by the jail as a request or a grievance in when Part B is given back to the inmate? A. That is correct."); *see also id.* at 71:9-12 (describing "Part B" as the response form).

14

> THE WITNESS: Yes.
>
> THE COURT: —and he waits 16 days from that date. Is that a timely grievance?
>
> THE WITNESS: We still would have to accept it and process it.
>
> THE COURT: Okay. But you would think it's—you would deem it to be untimely.
>
> THE WITNESS: Oh. If it was after the 15 days, yes, it—but we would still have to process it nonetheless.

Hrg. Tr. at 151:11-152:1; *see also id.* at 155:24-156:2 ("Q. Well, when you take about processing it, you're not talking about making it a grievance, you're talking about processing it as either a grievance or a request, correct? A. Right. Depending on the nature of the grievance, right.").

An administrative remedy is not available if it is "hopelessly unclear whether any administrative remedy remained open for the prisoner[ ]." *Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005) (internal alteration and citation omitted) (finding that the defendants did not meet their burden on an exhaustion defense in part because they failed to "point to any regulation or department policy that clearly identifies how a prisoner challenges [the alleged misconduct]"). The Inmate Handbook is silent about appealing requests, and jail staff says unequivocally that requests cannot be appealed. The language on the grievance form does, in theory, create an avenue by which an inmate can appeal a request, but the confusing and contradictory testimony of jail personnel suggests that this language is not reasonably implemented in practice or realistically available to inmates, at least based on the testimony presented at the hearing and in this case. *See King*, 781 F.3d at 893 ("Prison authorities cannot immunize themselves from suit by

establishing procedures that in practice are not available."). It is ultimately Defendants' burden to establish that Harper failed to exhaust administrative remedies that were available to him. *Maddox*, 655 F.3d at 720. Defendants have not proven that the procedures that they believe Harper failed to exhaust were available to him.

## IV. Conclusion

For the reasons discussed above, the Court concludes that Defendants have not carried their burden of proving that Harper failed to exhaust his administrative remedies prior to filing suit. Harper's claims will not be dismissed on exhaustion grounds.

ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 24, 2015